# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KYONG POLACHEK,
a/k/a "Ji-Yeon Kim,"
"Jennifer and "Hana,"

DEFENDANT.

06- 862M

WARRANT FOR ARREST

CASE NUMBER: 1:06-M-77M

TO: The United States Marshal
and any Authorized United States Official;

YOU ARE HEREBY COMMANDED to arrest KYONG POLACHEK , a/k/a "Ji-Yeon Kim," "Jennifer and "Hana,"

and bring him or her forthwith to the nearest magistrate to answer a(n)

Indictment ☐ Information X Complaint Order of Court ☐ Violation Notice ☐ Probation Violation Petition

charging him or her with (brief description of offense)

knowingly and intentionally transporting an individual in interstate and foreign commerce with intent that such individual engage in prostitution,

In violation of Title 18 United States Code, Section(s) 2421 and 2

HON. KIYO MATSUMOTO
Name of Issuing Officer

UNITED STATES MAGISTRATE JUDGE
Title of Issuing Officer

Signature of Issuing Officer

August 14, 2006 BROOKLYN, NY
Date and Location

Bail fixed at $ ______ By ______

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at ______ | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

PKC:STM
F.# 2006R00790

1:06-M-77M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

v.

TAE HOON KIM,
also known as "Tae Won,"
SUNG CHUL IL,
also known as "Seong-Cheol" and "Cheol-I,"
FNU LNU,
also known as "Seong Ho,"
TAE JUN PARK,
also known as "Tae Ho Choi,"
DO HYUP BAE,
also known as "Do Hyeop,"
BYUNG CHUL SHIN,
also known as "Byeong-Cheol,"
FNU LNU,
also known as "Hong Tae" and "Hong Pyo,"
KYONG POLACHEK,
also known as "Ji-Yeon Kim," "Jennifer" and "Hana,"
BYOUNG IL SON,
also known as "Mr. Son,"
JIN SOOK KIM LEE,
MIAE CHOI-SON and
FNU LNU,
also known as "Jong Tae,"

Defendants.

- - - - - - - - - - - - - - - - -X

**Filed Under Seal**

AFFIDAVIT IN SUPPORT OF ARREST WARRANTS
(T. 18, U.S.C., §§ 2, 371, 2421, 1960(a) and 3148)

EASTERN DISTRICT OF NEW YORK, SS:

WON YOON, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

Upon information and belief, on or about and between

February 2006 and August 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants TAE HOON KIM, also known as "Tae Won," SUNG CHUL IL, also known as "Seong-Cheol" and "Cheol-I," FNU LNU, also known as "Seong Ho," TAE JUN PARK, also known as "Tae Ho Choi," DO HYUP BAE, also known as "Do Hyeop," BYUNG CHUL SHIN, also known as "Byeong-Cheol," FNU LNU, also known as "Hong Tae" and "Hong Pyo," and KYONG POLACHEK, also known as "Ji-Yeon Kim," "Jennifer" and "Hana," together with others, did knowingly and intentionally transport an individual in interstate and foreign commerce with intent that such individual engage in prostitution.

(Title 18, United States Code, Sections 2421 and 2)

Upon information and belief, there is probable cause to believe that on or about and between February 2006 and August 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants TAE HOON KIM, also known as "Tae Won," BYOUNG IL SON, also known as "Mr. SON," JIN SOOK KIM LEE, MIAE CHOI-SON and FNU LNU, also known as "Jong Tae," together with others, did knowingly and intentionally conspire to conduct, control, manage, supervise, direct and own all and part of a business, knowing that the business was an illegal money transmitting business, which affected interstate and foreign commerce, in violation of Title 18, United States Code, Section 1960(a).

(Title 18, United States Code, Section 371)

Upon information and belief, on or about and between February 2006 and August 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BYOUNG IL SON, also known as "Mr. Son," having been released on bail, did knowingly and intentionally commit another federal violation while on bail, to wit, conspiracy to violate Title 18, United States Code, Section 1960(a), in violation of a condition of his release.

(Title 18, United States Code, Section 3148)

The source of your deponent's information and the grounds for his belief are as follows:

I. Introduction

1. Since 2002, I have been a Special Agent with the FBI, and since April 2003, I have been assigned to the Asian Criminal Enterprises Unit of the New York Division of the Federal Bureau of Investigation ("FBI"). From 1997 to 2002, I served as an officer with the Nassau County Police Department.

2. I have personally participated in the instant investigation of the defendants. I am fully familiar with the facts and circumstances of this investigation based upon my participation in the investigation; my review of conversations intercepted pursuant to court authorization, either by listening to the recordings or reviewing transcripts of the recordings;[1] my

---

[1] Most of these conversations are in Korean, but I speak, read, and write fluently in Korean. In addition, these conversations were also summarized in writing and in English by Korean translators.

review of oral and written reports about this and other investigations that I have received from other Special Agents of the FBI and the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), officers of the New York City Police Department, and other state, local and federal law enforcement officers; physical surveillance of the defendants by me and other law enforcement agents and officers; witness interviews; and my review of records and documents including, but not limited to, analysis of telephone toll records, pen register records, and subscriber information.

3. In the portions of this Affidavit that describe the intercepted conversations, not all relevant intercepted communications are described. Moreover, for those communications that are described herein, not all relevant portions of these conversations have been described. Unless otherwise indicated, these descriptions are based upon preliminary non-verbatim summaries of the conversations prepared by translators. To the extent that quotations are used in the descriptions, the quoted segments are based on line sheets and reviews of recordings and not final transcripts. Also, all dates and times are approximate and based on the monitoring equipment at the time the communication was intercepted. Lastly, bracketed information within the descriptions of the intercepted conversations is based on other evidence obtained during the investigation or on my interpretation of the conversation given the context of the conversation and my knowledge of the investigation.

4. In the section below that describes surveillance, all surveillance was conducted by Special Agents of the FBI, including myself, and ICE. The observations of the other law enforcement agents have been related to me to supplement the activities that I personally observed.

5. Through my training, education and experience, I have also become familiar with the illegal transmission of money, also known as "hawala," whereby money is transferred via a network of hawala brokers, or "hawaladars." Typically, an individual approaches a hawala broker in one city and gives the broker money to be transferred at black market currency exchange rates to a recipient in a foreign city. The hawala broker calls another hawala broker in the recipient's city and tells the recipient broker how much money and to whom to disperse the funds, minus a small commission, with the assurance that the debt will be settled later. In conjunction with hawala transactions, I have also become familiar with the efforts of persons involved in such activity to avoid detection by law enforcement.

6. Because this Affidavit is being submitted for the limited purpose of obtaining arrest warrants, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to obtain the requested warrants. Where actions, conversations, and statements of others are reported in this Affidavit, they are reported in substance and in part unless otherwise indicated. Additionally, except as

explicitly set forth herein, I have not distinguished in this Affidavit between facts of which I have personal knowledge and facts as to which I have hearsay or second-hand knowledge.

## II. Probable Cause for the Requested Warrants

### A. Background: Cho/Chae Investigation

7. Since approximately May 2005, the FBI and ICE have been conducting a joint investigation into the smuggling, trafficking and transportation of women from Korea into the United States for the purpose of prostitution. The initial investigation focused on two individuals, Ae Soon Cho, also known as "Gina Kim" ("Cho"), and Geeho Chae ("Chae"), who were operating a large brothel in Flushing, New York, in which women from Korea worked as prostitutes.

8. In November 2005, court authorization was obtained to intercept conversations over Cho's and Chae's telephones (respectively, the "Cho Wiretap" and "Chae Wiretap"). Pursuant to subsequent re-authorizations, the Cho and Chae Wiretaps continued until March 8, 2006. Based on conversations intercepted through the Cho and Chae Wiretaps and additional investigation, a third wiretap was obtained on March 8, 2006 for the cellular telephone of defendant TAE HOON KIM, also known as "Tae Won" (the "KIM Wiretap"). Pursuant to subsequent re-authorizations, the KIM Wiretap continued until June 4, 2006.

9. Through the Cho/Chae investigation, the FBI and ICE determined that between approximately January 2004 and March 2006, Cho and Chae operated four brothels in Queens at which they

employed numerous prostitutes who were from Korea. Many of the women had entered the United States illegally without visas or had entered with visas that were fraudulently obtained. In addition to operating the brothels, Cho and Chae maintained a separate residence (also known as a "stash" or "resting" house) to house their prostitutes. Cho's and Chae's brothels generally charged customers between $140 and $200 per session and generated approximately $4,000 per day in revenue.

10. Through the investigation, FBI and ICE also determined that there existed a large number of Korean brothels similar in operation to Cho's and Chae's brothels that extended along the eastern seaboard from Massachusetts to Georgia. The brothel owners, including Cho and Chae, relied on the services of a network of Korean middlemen who were based in Queens, New York, including defendant TAE HOON KIM, also known as "Tae Won" ("KIM") and other defendants, to arrange for prostitutes to work at and be transported to and between the brothels. The brothel owners asked the middlemen to find women for their brothels based on certain criteria such as immigration status, age, looks and body type. The middlemen also assisted the women in identifying and obtaining more lucrative and favorable work conditions among the various brothels.

11. Through the investigation, the FBI and ICE also determined that KIM and other defendants assisted the Korean brothel owners and prostitutes in transmitting proceeds from

their brothel activities and other funds overseas, usually to Korea, through unlicensed money transmitters.

12. On March 8, 2006, Cho and Chae were arrested by FBI and ICE agents. On April 6, 2006, they were indicted in this District on charges of conspiring to employ and harbor aliens for the purpose of prostitution, and conspiring to bribe and bribing New York City Police Department detectives in order to protect their brothel operation. (United States v. Ae Soon Cho, et al., 06 CR 234(SLT)).

B. The Defendants' Role as Middlemen for the Brothels

13. Wiretap Evidence. The KIM Wiretap revealed conversations on an almost daily basis between defendant KIM and various brothel owners, prostitutes, and other drivers and middlemen, including defendants SUNG CHUL IL, also known as "Seong-Cheol" and "Cheol-I," FNU LNU, also known as "Seong Ho," TAE JUN PARK, also known as "Tae Ho Choi," DO HYUP BAE, also known as "Do Hyeop," BYUNG CHUL SHIN, also known as "Byeong-Cheol," FNU LNU, also known as "Hong Tae" and "Hong Pyo," and KYONG POLACHEK, also known as "Ji-Yeon Kim," "Jennifer" and "Hana," in which KIM negotiated, discussed, and arranged for prostitutes to work at and be transported to and between brothels in several different states and the District of Columbia, as set forth below.

(i) SUNG CHUL IL, also known as "Seong Cheol" and "Cheol-I" ("CHEOL-I")

Washington, D.C.

14. On February 23, 2006, at approximately 7:30 p.m., KIM told CHEOL-I that a female known as "Su Jeong" would be flying out of Los Angeles the following evening and would arrive at Reagan International airport [in Virginia] at approximately 10:00 or 11:00 p.m. CHEOL-I asked Su Jeong's age, if she was attractive, and if she had large breasts. KIM responded that Su Jeong was 29 or 30 years old, that she was not great but okay, and that she had average-sized breasts. KIM told CHEOL-I to call Su Jeong for more information and for her schedule, and KIM provided CHEOL-I with Su Jeong's telephone number. At approximately 7:27 p.m., Su Jeong called from a Los Angeles-based cellular mobile telephone number. Su Jeong asked KIM where she would be working, and KIM responded that it was "Dupont" [brothel in Washington, D.C.]. KIM told Su Jeong to fly directly to Washington, D.C., so that KIM could pick her up at and take her directly to the brothel. KIM also told Su Jeong that she could earn $20,000 [per month]. At approximately 8:58 p.m., KIM received a call from a female known as "Eun Ju," who was also flying into Reagan Airport from Los Angeles the following day. Eun Ju asked how much she should pay for the transportation fee from the Washington airport to the brothel. KIM said that it would cost $500, and that CHEOL-I would be driving her. FNU LNU 1 stated that she would arrive at 8:20 p.m., and had already talked with CHEOL-I. FNU LNU 1 asked KIM how much she could earn

at the "Dupont" brothel [in Washington, D.C.] where she would be working. KIM stated that, according to CHEOL-I, FNU LNU 1 could make $20,000 [per month]. At 11:25 p.m. on the same date, CHEOL-I called KIM for directions to Reagan Airport.

Pennsylvania

15. On February 28, 2006, at approximately 3:49 p.m., an unknown female, FNU LNU 2, who was calling from "Grandma's" [brothel in Washington, D.C.], asked KIM if KIM supplied girls[2/] to "Smile" brothel [in Pennsylavnia]. KIM confirmed that he did, and FNU LNU 2 informed KIM that there would be an opening at "Smile" on March 3rd. KIM stated that it was CHEOL-I's turn to provide girls for "Smile," and that KIM's turn would be on the 24th.

16. On March 5, 2006, at approximately 9:58 p.m., an unknown female, FNU LNU 3, called KIM and asked him to place her at "Smile" brothel in Pennsylvania. KIM told FNU LNU 3 that another girl was being placed at "Smile" through CHEOL-I, and that only KIM and CHEOL-I were supplying girls to that brothel. KIM gave CHEOL-I's phone number to FNU LNU 3 and told her to call CHEOL-I for more information.

17. On March 6, 2006, at approximately 6:00 p.m., KIM spoke with an unknown female, FNU LNU 4, who asked KIM to place her in a brothel. FNU LNU 4 said that the income in Washington, D.C. was approximately $17,000, but that going to remote

---

- The term "girl" is a literal translation of the word used by the participants in the intercepted conversations, but does not necessarily refer to minors or underage women.

locations was not worth the transportation costs. FNU LNU 4 stated that the last time she went to an Ohio brothel through CHEOL-I, she paid $800 in transportation costs but did not earn much at the brothel.

18. On April 13, 2006, at approximately 4:26 p.m., CHEOL-I told KIM that he (CHEOL-I) had taken a girl to Big Sister Kim's brothel in Connecticut that day. KIM commented that girls can make between $15,000 to $17,000 in that brothel. KIM commented that "Oriental" brothel in Washington, D.C., which was open 24 hours a day and used to be called "Boss" brothel, was also doing good business. CHEOL-I agreed. KIM stated that he was the one who had recommended to Laura, who now owns Oriental, that she buy the brothel, and that it cost her $130,000. KIM stated that ["Oriental's"] business was booming, and that three girls worked there, serving thirteen customers a day, seven days a week. KIM and CHEOL-I commented that Laura also had good business in Atlantic City [New Jersey]. KIM stated that "Oriental" brothel in Washington, D.C. was the best, but that "Oriental" in Connecticut was getting better. KIM and CHEOL-I agreed that they wished they owned places like these. KIM and CHEOL-I also discussed customer traffic and earning potential for "Yorktown," "Oasis" and "Good Natural" brothels [all in Pennsylvania]. KIM asked CHEOL-I how long KIM and CHEOL-I had been doing "this work," and CHEOL-I responded that it had already been four years. KIM commented that although CHEOL-I was

arrested many times for this type of work, he had gotten rich. CHEOL-I agreed.

19. On May 12, 2006, at approximately 5:31 p.m., defendant TAE JUN PARK, also known as "Tae Ho Choi" ("CHOI") told KIM that Kyung-Jin[3/] [a brothel worker] had been arrested during a Rhode Island raid. KIM stated that he was close to Kyung-Jin. At approximately 8:42 p.m. that day, CHEOL-I asked KIM if he knew any of the girls who were arrested [at "Downtown" in Rhode Island.] KIM said that he knew Kyung-Jin. CHEOL-I said that Kyung-Jin was detained by Immigration because she did not have a green card. CHEOL-I and KIM discussed the possibility that Kyung-Jin could be deported. KIM stated that he pitied Kyung-Jin and that he had placed her at "MaekDo's" [the owner of "Downtown"] brothel a long time ago. At approximately 9:05 p.m., a female known as "Big Sister MaekDo" asked KIM if there were sex workers with valid visas available. MaekDo urged KIM to look for sex workers for "Downtown" immediately, as her business was extremely busy.

20. On June 2, 2006, at approximately 7:25 p.m., an unknown female, FNU LNU 5, told KIM that DO HYEOP had told her that the girls arrested from "Downtown" brothel in Rhode Island were asked to identify drivers. KIM stated that he had heard the same directly from the arrested girls. KIM stated that a Korean cop asked the Rhode Island girls about the drivers, but that the

---

- Interpreters phonetically translated "KYUNG JIN" as "Gyeong-Jin" during the initial synopsis for this recorded conversation.

girls said they had taken a bus from a casino. KIM stated that his (KIM'S) name was also mentioned during Cho's arrest. FNU LNU 5 said that she had seen DO HYEOP earlier and that DO HYEOP was very stressed because his name, along with KIM's and CHEOL-I's names, were mentioned by law enforcement during the Rhode Island raid.[4/]

(ii) FNU LNU, also known as "Seong Ho" ("SEONG HO") Connecticut

21. On February 15, 2006, at approximately 8:54 p.m., KIM called an unknown female, FNU LNU 6. [FNU LNU 6 is the owner of "Magic" brothel in Waterbury, Connecticut.] KIM told her that he had a female with a permanent resident card that he could place at FNU LNU 6's brothel on Saturday, February 18, 2006.

22. On February 17, 2006, at approximately 7:15 p.m., KIM told a female known as "Candy" that his brother-in-law would be driving her from New York to an undisclosed location at 8:00 p.m. the following day. [SEONG HO is the brother of KIM's wife, JIN SOOK KIM LEE ("JIN SOOK").]

---

- On May 11, 2006, ICE raided several brothels, including "Downtown," in Providence, Rhode Island. Following the raid, FBI and ICE agents interviewed numerous workers arrested at those locations. The owner of "Downtown" is known as "MaekDo." Among the interviewed workers was a female identified as Kyung Jin Park. During Park's interview, she claimed that she had arrived at "Downtown" via a bus from a gambling parlor. Although she denied working as a prostitute, she admitted knowing KIM. However, she claimed that KIM was a friend and had never transported her to any brothel or arranged for her to work as a prostitute. A consent search of Ms. Park's cellular mobile telephone revealed the telephone numbers of KIM, CHEOL-I, DO HYEOP, another middleman by the name of Minseok Kong, also known as "Su Bok," and numerous known sex workers.

23. On February 17, 2006, at approximately 8:13 p.m., FNU LNU 6 [the owner of "Magic" brothel] called KIM, who told FNU LNU 6 that KIM would be taking a girl to her brothel at 8:00 p.m. the following day.

24. On February 18, 2006, at approximately 5:15 p.m., KIM told FNU LNU 6 that his brother-in-law, SEONG HO, would be transporting the girl to her brothel that evening. FNU LNU 6 provided KIM with the phone number to the brothel, which indicated that the brothel was located in Connecticut.

25. On February 18, 2006, at approximately 5:22 p.m., KIM gave Candy's phone number to SEONG HO and ordered SEONG HO to call Candy at 7:00 p.m. to confirm her ride to "Magic" at 8:00 p.m. SEONG HO confirmed that "Magic" was the brothel behind the gas station. KIM told SEONG HO to get $200 from Candy for the ride. Subsequently, SEONG HO called KIM and told KIM that SEONG HO's departure time had changed to 9:00 p.m.

26. On February 18, 2006, at approximately 10:09 p.m., KIM informed FNU LNU 6 that the sex worker had left for FNU LNU 6's brothel ["Magic"] at 9:00 p.m., and would be there in 30 minutes to one hour. At approximately 11:11 p.m., SEONG HO called KIM and told KIM that the girl he had transported had given him $340, which was too much money.

Washington, D.C.

27. On February 27, 2006, at approximately 4:46 p.m., KIM called a female known as "Eun Jeong" who was staying at Cho's resting house located at 149-16 Barkley Avenue in Queens, New

York. KIM told Eun-Jeong that he would be picking up an unknown female, FNU LNU 7, from the Barkley Avenue location, and that Eun-Jeong should tell FNU LNU 7 to be ready by 6:40 p.m.

28. On February 27, 2006, at approximately 5:16 p.m., KIM told SEONG HO to go to "18" brothel [in Washington, D.C.] and collect money from a female known as "Ji-min." KIM told SEONG HO to also pick up an unknown female, FNU LNU 8, from 149-16 Barkley by 6:00 p.m. and take her to "Grandma's" brothel [in Washington, D.C.]. KIM further instructed SEONG HO to take a female known as "Min-jeong" to "Royal" brothel. KIM told SEONG HO that the transportation fee would be $400 for FNU LNU 8 and Min-Jeong. KIM told SEONG HO that he might need to pick up another female, FNU LNU 9, from "Royal" and told SEONG HO to collect $250 from FNU LNU 9 as a transportation fee. At approximately 8:35 p.m., KIM again gave SEONG HO detailed directions to "Grandma's Place" brothel in Washington, D.C. On February 28, 2006, at approximately 12:07 a.m., KIM told SEONG HO to go to "Happiness" and "Royal" brothels in Washington, D.C. At approximately 12:43 a.m., SEONG HO told KIM that he went to "Royal" and received $400 from Min-Jeong, who also gave SEONG HO an envelope for KIM. SEONG HO told KIM that "Grandma's" had underpaid by $200. SEONG HO told KIM he had received money from a female known as "Mimi" at Happiness, and received two envelopes from Happiness, but did not get any transportation fee. KIM told SEONG HO that, next time, he should ask the girls or owners to pay the transportation fee. KIM stated that, if there is a girl who asks for a delivery

of an item, that SEONG HO should tell her the charge would be $50 regardless. SEONG HO said that he understood and agreed to make a final stop at "18" [brothel in Washington, D.C.] for KIM .

South Carolina

29. On March 31, 2006, at approximately 3:57 p.m., KIM told SEONG HO to charge girls $1,000 to $1,300 if they wanted to go to South Carolina, given that it takes 15 hours to drive to Georgia.

Connecticut

30. On April 14, 2006, at approximately 7:17 p.m., KIM told SEONG HO to pick up an unknown female, FNU LNU 10, from a motel in Flushing [Queens, New York] and take her to "Liberty" brothel in Connecticut. KIM gave SEONG HO directions to "Liberty."

Pennsylvania

31. On May 11, 2006, at approximately 2:58 p.m., KIM told SEONG HO to go to a Chinese bus terminal near "Royal" brothel in Philadelphia [Pennsylvania]. KIM told SEONG HO that the brothel was raided and that all the girls had been taken away, except one girl who had escaped and was at the bus terminal.

(iii) TAE JUN PARK, also known as "Tae Ho Choi" ("CHOI")

Connecticut

32. On February 27, 2006, at approximately 4:19 p.m., a female known as "Yumi" asked KIM if there was any work available for her, specifically a place with fewer working girls

and fewer customers [ie., a less busy location]. KIM said he would try to find a place for her and let her know immediately. At approximately 5:24 p.m. on the same date, KIM told Yumi that she would be going to "Crystal" [brothel] and that she should be ready by 8:00. KIM told Yumi that the brothel was not open 24 hours a day, but that she would have to work as soon as she arrived there. KIM told Yumi that his "younger brother" [a Korean term that does not necessarily mean a familial relationship and can refer to a friend or associate] would be taking her to the brothel.

33. On February 27, 2006, at approximately 7:30 p.m., KIM asked CHOI to pick up an unknown female, FNU LNU 11, and take her to "Crystal" [brothel] in [Norwalk] Connecticut. CHOI asked which exit he should take, and KIM responded that he believed that "Nirvana" [brothel] was off of exit 15, and that "Crystal" was off of exit 14. KIM told CHOI to pick up FNU LNU 11 at 8:00 [p.m.], and that the transportation fee would be $150. CHOI said that he understood. At approximately 8:45 p.m. on the same day, KIM asked CHOI when he would be arriving in Connecticut, and CHOI responded that he would be arriving in 30 minutes. KIM reminded CHOI to use exit 14. At approximately 9:16 p.m., CHOI told KIM that KIM had forgotten to buy "rubbers" [condoms] for the brothel that CHOI had gone to that day.

34. On March 6, 2006, at approximately 1:57 p.m., CHOI complained to KIM that the owner of "Crystal" treated the

girls poorly. KIM remind CHOI to pick up a girl from "Crystal" by 4:30 p.m.

35. On March 14, 2006, at approximately 9:13 p.m., while CHOI and KIM were both transporting girls, they discussed how much girls were making at a brothel named "Central" [in Rhode Island]. KIM responded that girls could easily make $18,000 to $20,000 per month. CHOI stated that he would be going to "Central" the following Saturday.

36. On April 10, 2006, at approximately 11:22 p.m., KIM complained to CHOI that work was slow. CHOI stated that he was trying to steer girls to KIM for rides instead of DO HYEOP. CHOI recommended that KIM call a female known as "Su-a" because Su-A wanted to be placed at "Grandma's" brothel. CHOI had recommended KIM to Su-A because KIM knew so many brothels. CHOI also mentioned that he had taken Yuni to [Big Sister] Lilly's brothel in Manhattan. KIM said that he was receiving a lot of calls from "Lilly's." KIM stated that there was a shortage of brothel positions, but not of girls. CHOI asked KIM about business in Pittsburgh [Pennsylvania], and KIM responded that business there was not good.

37. On April 29, 2006, at approximately 7:55 p.m., CHOI and KIM discussed the recent raid on brothels in Waterbury, Connecticut. CHOI stated that he was bailing out numerous girls who had been arrested. CHOI noted that he had to bail out an additional girl because he had her passport. CHOI and KIM

discussed the fact that a driver was also arrested during the raid.

38. On May 9, 2006, at approximately 7:34 p.m., CHOI asked KIM if there was a girl available to go to "Nirvana" [brothel in Connecticut]. KIM stated that he would ask around. CHOI and KIM discussed how girls were leaving "Nirvana" because of the raid. CHOI stated that he had supplied a female known as "Mi-Yeong" to "Nirvana" two days earlier, and that CHOI had supplied Mi-Yeong's friend [to Nirvana] that day. CHOI noted that business at "Nirvana" was good, and that he would be going to Connecticut again that day.

39. June 2, 2006, at approximately 10:50 p.m., CHOI told KIM that "Big Sisters" [older sex workers] had nowhere to work since the raid at "Hong Kong" brothel [in Waterbury, Connecticut]. KIM agreed, and added that there were no good income-generating brothels in Manhattan that would hire older sex workers. CHOI stated that he had tried to place a woman at "Lilly's" brothel [in Manhattan], but that she was turned down because she was 39 years old.

(iv) <u>DO HYUP BAE, also known as "Do Hyeop" ("DO HYEOP")</u>

<u>Washington, D.C.</u>

40. On May 6, 2006, at approximately 11:10 p.m., DO HYEOP asked KIM for help because DO HYEOP was supposed to drive a girl to "Grandma's Place" [brothel] in Washington, D.C. that evening, but the girl had cancelled because she had started her menstrual cycle unexpectedly. DO HYEOP had told the brothel

owner that he would bring a different girl the following day, but DO HYEOP could not find an available girl. KIM said that he would call around to find someone. KIM asked how much girls could make at "Grandma's Place," and DO HYEOP responded that it varied, but the girls were making $17,000 to $18,000. KIM stated that he had placed a female known as "Jin Hui" at "Grandma's Place" who had earned more than that.

41. On May 7, 2006, at approximately 1:33 a.m., DO HYEOP called KIM to find out if KIM had located anyone for Grandma's brothel the following day. KIM said he was unable to find a girl. DO HYEOP told KIM that the owner of "Grandma's" would call KIM or CHEOL-I for a girl. DO HYEOP and KIM discussed the fact that it was difficult to find brothels where girls could make good money these days.

42. On May 11, 2006, at approximately 7:22 p.m., DO HYEOP and KIM discussed raising the transportation fee for sex workers from $50 to $100 per trip. DO HYEOP told KIM that CHEOL-I opposed raising the transportation fees for sex workers because the girls were not making good money. DO HYEOP asked KIM to talk to CHEOL-I about raising the fees, and KIM agreed that he would do so. DO HYEOP stated that he had started charging the increased fee that day, and would charge $350 for trips to brothels in Atlantic City and $300 for trips to brothels in Philadelphia. DO HYEOP had told a Boston-bound sex worker that the fare had increased from $450 to $500. DO HYEOP stated that it would cost $550 to go to Washington, D.C. DO HYEOP and KIM

agreed that the sex workers would not make a big deal out of paying $50 to $100 more. DO HYEOP again asked KIM to persuade CHEOL-I about the fare increase; KIM said that he would.

(v) BYUNG CHUL SHIN, also known as "Byeong-Cheol" ("SHIN")

Washington, D.C.

43. On or about March 5, 2006, at approximately 9:01 p.m., KIM called a female known as "Eun-A." KIM told Eun-A that he would be going to her location the next day with a girl. Eun-A responded that girls were earning $2,000 per day at her location and asked KIM to hurry and bring more girls. KIM told Eun-A that he would be sending SHIN to her brothel instead of going himself.

44. On or about March 6, 2006, at approximately 3:19 a.m., KIM told SHIN to pick up a female who was arriving via Alaska Airline, not Delta, at Terminal B. KIM said that he knew it was Terminal B because he had picked up two females from Los Angeles the day before at the same airport. SHIN told KIM that he would take the female to a brothel known as "Downtown," where Eun-A used to work. SHIN stated that he was in New Jersey and would contact KIM shortly.

45. On or about March 6, 2006, at approximately 8:51 p.m., an unidentified female, FNU LNU 1, called KIM from the same Los Angeles-based cellular mobile telephone, (213) 507-5628, which she used to call KIM on February 23, 2006 (see Paragraph 15). FNU LNU 1 told KIM that she had spoken to KIM's junior associate, but had not met up with him yet because she was

retrieving her luggage. At approximately 8:54 p.m., SHIN called KIM and told KIM that he had picked up FNU LNU 1, but that she could not pay for the transportation. KIM assured SHIN that KIM would pay for the transportation when they "came up." At 9:21 p.m., SHIN called KIM to tell him that he was leaving the brothel, "Downtown" [in Washington, D.C.].

Connecticut

46. On or about April 23, 2006, at approximately 12:53 a.m., KIM called SHIN. During the call, KIM asked SHIN where he was located. SHIN responded that he was driving "down" from New Haven, Connecticut. KIM asked SHIN to stop at "Liberty" [brothel in Connecticut] to pick up a girl and take her to an unknown location. SHIN agreed to do so and KIM provided directions to "Liberty" brothel. KIM further told SHIN to transport the female for $100. KIM instructed SHIN to tell the girl that he (SHIN) was coming from the New York area, and ask her if she would need a return ride to Connecticut the following day. When SHIN requested the girl's contact information, KIM responded that it was unnecessary because everyone knew KIM at that brothel and SHIN could just announce that KIM had sent SHIN. KIM told SHIN that the brothel would close at 2:00 or 3:00 a.m., so SHIN had to be there before that time.

(vi) FNU LNU, also known as "Hong Tae" and "Hyong Pyo" ("PYO")

Washington, D.C.

47. On February 27, 2006, at approximately 7:29 p.m., PYO told KIM that he was on his way back to Flushing to pick up one girl and take her to "Dupont" brothel [in Washington, D.C.].

Virginia

48. On March 18, 2006, at approximately 4:00 p.m., KIM asked PYO if PYO knew where "Champion" brothel was located in Virginia; PYO knew the location. PYO gave KIM detailed directions to "Champion" brothel in Manassas, Virginia.

49. On March 29, 2006, at approximately 7:09 p.m., a female known as "Jae Hui" asked KIM if he would be driving to her location that day. KIM responded that his schedule was cancelled, but KIM said that PYO would be going to Jae Hui's location. KIM encouraged Jae Hui to call PYO. At approximately 11:58 p.m. on the same day, PYO told KIM that a girl from Grandma's place in Washington, D.C. had given PYO an envelope with $500 in it for KIM. The following day, at approximately 4:59 p.m., PYO told KIM that a girl had given PYO $500 for KIM's transportation fee.

Rhode Island

50. On April 25, 2006, at approximately 11:41 p.m., KIM asked PYO if he could immediately drive to "Bally" brothel in Rhode Island to pick up Candy. KIM instructed PYO to charge Candy the regular fare if she wanted to return to Flushing, New York and $400 if she wanted to go to Long Island, New York.

51. On April 26, 2006, at approximately 9:41 p.m., CANDY called KIM and asked which driver would be picking her up. KIM responded that PYO would pick her up, and gave PYO's phone number to Candy.

(vii) <u>KYONG POLACHEK, also known as "Ji-Yeon Kim," "Jennifer" and "Hana" ("JI-YEON")</u>

<u>Flushing, New York</u>

52. On March 4, 2006, at approximately 8:11 p.m., JI-YEON called KIM and told him that she had opened a brothel. JI-YEON asked KIM to find JI YEON a young, pretty girl for a "fantasy" brothel. JI-YEON told KIM that sex workers at her new brothel usually made $600 per day on the weekdays and more than $1000 per day on weekends. JI-YEON expected the number of customers to increase, and expected a lot of support from Manhattan drivers since she had worked in Manhattan [as a sex worker] for a long time. JI-YEON stated that she had agreed with her girls not to charge them for meals and to provide them with a lawyer in case they had problems with law enforcement. KIM agreed that JI-YEON's working conditions were good. KIM asked JI-YEON if he could tell girls that they could make $20,000 [per month] at JI-YEON's brothel. JI-YEON responded that her brothel was a "choice" brothel so that customers could choose their girls [meaning that some girls may not be chosen as often and would earn less]. At approximately 8:31 p.m. on the same day, KIM called JI-YEON and told her that he would place a girl at JI-YEON's brothel the following day or the day after.

53. On April 25, 2006, at approximately 11:27 p.m., JI-YEON asked KIM if there were any girls available, but KIM responded that there was a shortage of girls. JI-YEON asked KIM if the girls were not working because they were scared, and if there was any area that had been raided. KIM responded that he was just having a hard time providing girls, and that no area in particular had been raided. JI-YEON decided not to advertise for a while, and KIM asked JI-YEON if she had all the girls that she needed. JI-YEON told KIM that she called KIM because she needed more girls. KIM suggested that JI-YEON ask a female sex worker known as "Seon-u." JI-YEON responded that Seon-U had suggested that JI-YEON close the brothel because there had been a raid in Flushing. JI-YEON complained about Seon-U, but stated that Seon-U had a child-like face, so that Korean customers liked her. KIM responded that he would continue to look for girls for JI-YEON.

54. On May 12, 2006, at approximately 12:59 a.m., JI-YEON asked KIM for a girl for her brothel. JI-YEON stated that her brothel provided good income to sex workers, and had a good customer volume even without running many ads. At approximately 4:28 p.m. on the same day, KIM told JI-YEON that girls were not willing to go to JI-YEON's brothel because it was located in Flushing. KIM and JI-YEON wondered why girls avoided working in Flushing. JI-YEON asked him to continue looking for a girl. KIM asked JI-YEON if she would be willing to go to Connecticut to work at a brothel. JI-YEON said she would not go to other locations to work since she now owned her own brothel.

55. On May 14, 2006, at approximately 12:32 a.m., JI-YEON again asked KIM to supply a girl for her brothel on Monday.

Connecticut

56. On April 10, 2006, at approximately 8:56 p.m., JI-YEON told KIM that a female brothel owner known as "Big Sister Kim" needed a girl for her Connecticut brothel, and that KIM should get a pretty, young girl.

57. Physical Surveillance. Physical surveillance of KIM, conducted in conjunction with the wiretap, confirmed KIM's transportation of Korean female sex workers across state lines, as set forth below.

Washington, D.C.

58. On April 28, 2006, at approximately 8:11 p.m., a female known as "Yu-Ri" told KIM that she wanted to go to another state to work. KIM told her there were openings at "Downtown" brothel in Washington, D.C., or at either "Royal" brothels in Philadelphia, Pennsylvania or in Washington, D.C. Yu-Ri told KIM to place her anywhere.

59. On April 29, 2006, at approximately 7:17 p.m., Yu-Ri told KIM that she would not be able to work until Wednesday.

60. On Monday, May 1, 2006, at approximately 5:18 p.m., KIM called Yu-Ri and asked if Yu-Ri could go to "Royal" brothel in Washington, D.C., where only four other girls were working. KIM and Yu-Ri agreed to go to "Royal" on Wednesday evening.

61. On Wednesday, May 3, 2006, at approximately 1:44 p.m., KIM called Yu-Ri and asked if they could leave for the brothel at 6:00 p.m.; Yu-Ri agreed. On May 3, 2006, at approximately 1:46 p.m., a female known as "Tae-eun" called KIM and asked what time KIM could bring a girl that day. KIM responded that he would leave around 6:00 p.m. At approximately 4:55 p.m., CHOI called KIM, who told CHOI that he would be heading to Washington, D.C. shortly.

62. At approximately 6:05 p.m., KIM called Yu-Ri and confirmed that she still lived on 155th Street. KIM told her that he was at a body shop at 154th Street having his oil changed, but would be at her place shortly. Yu-Ri told KIM that she had luggage, and KIM confirmed that he would pick her up very soon.

63. On May 3, 2006, at approximately 6:07 p.m., an agent who was conducting physical surveillance observed KIM leave a body shop located at 152-18A Northern Boulevard, in Flushing [Queens, New York]. KIM drove to the corner of Roosevelt and 155th Street and picked up a female carrying one bag. The bag was placed in the rear of the vehicle, and the female entered the passenger side of KIM's car.

C. <u>The Defendants' Role in Unlicensed Money Transmitting</u>

64. <u>Wiretap Evidence</u>. The KIM Wiretap revealed conversations on a frequent basis between the defendant TAE HOON KIM, also known as "Tae Won" ("KIM"), and various brothel owners, prostitutes, other middlemen and drivers, money transmitters and

others, including BYOUNG IL SON, also known as "Mr. Son," JIN SOOK KIM LEE, MIAE CHOI-SON, and FNU LNU, also known as "Jong Tae," in which KIM negotiated, discussed and arranged for unlicensed money transmitting, or hawala, to Korea, as set forth below.

(i) TAE HOON KIM, also known as "Tae Won" ("KIM")

65. On April 27, 2006, at approximately 11:23 p.m., KIM explained to a female known as "Gyeong-a" how hawala transactions worked. KIM told her that the money was not wired from the United States to an account in Korea, but that a Korean counterpart, an associate of the money transmitter in the United States, would give the money directly to a recipient in Korea. KIM further explained that, if Gyeong-A gave money to KIM for transmitting, KIM would give it to a money transmitter. The money transmitter would call Korea, and the transaction would be completed immediately. KIM explained that the largest amount that Gyeong-A would be able to send would be "1" or "2." KIM stated that large transactions involving $100,000 or $200,000 required more verification processes. KIM explained that [unlicensed] money transmitters' exchange rates were lower than the market exchange rate.

66. On March 13, 2006, at approximately 12:57 a.m., KIM told a female known as "Go-eun" that he could help her send money to Korea. KIM explained to Go-Eun that KIM sent money to Korea for sex workers through another individual because KIM would never use Western Union, which required identification.

(ii) BYOUNG IL SON, also known as "Mr. Son" ("SON")

67. On February 26, 2006, at approximately 7:56 p.m., SON called KIM and said that he had started a hawala business. KIM was glad because KIM had seven bills to exchange. KIM asked SON to come to KIM's location, and SON said that he would arrive there in 20 minutes. KIM indicated that he had two separate transactions, one for $6,000 and one for $7,000.

68. On February 27, 2006, at approximately 10:01 p.m., KIM asked SON if yesterday's money had gone in without problems. SON responded that it had, otherwise the girls would have complained. SON also asked KIM to tell CHEOL-I that SON was conducting hawala transactions now.

69. On April 12, 2006, at approximately 6:29 p.m., KIM told CHOI that he was doing hawala transactions with SON. KIM told CHOI that KIM would see if SON would do hawala transactions with CHOI. At 6:31 p.m. on the same date, KIM told SON that an individual he knew had $10,000 to send. SON agreed to do the transaction and told KIM that he (SON) would call him later. At 10:28 p.m., CHOI asked KIM if KIM's hawala line was operational, and KIM responded that he had not yet heard from SON. At 11:14 p.m. on the same day, KIM asked SON if SON would do hawala for another individual if KIM picked up the money and gave it to SON the following day. SON agreed, and KIM responded that he would call SON the following day.

70. On April 13, 2006, at approximately 7:50 p.m., KIM asked CHOI for the bank account number for the hawala

transaction. CHOI provided a bank account number for JAE-IL KOREAN BANK, identified the person as Eun-Hui Kim,[5] and stated that the amount was $10,000. At approximately 8:24 p.m. on the same day, CHOI asked KIM when he could tell the sender that the money had been transferred. KIM responded that the money would be transferred the same day. At 11:08 p.m., KIM told CHOI that the money should have been transferred, and that the exchange rate was 950 [Won per U.S. dollar]. KIM told CHOI to call the sender in thirty minutes and have that person verify the deposit [into the Korean bank account].

(iii) <u>MIAE CHOI-SON and (iv) JIN SOOK KIM LEE ("JIN SOOK")</u>

71. On May 1, 2006, at approximately 12:04 p.m., KIM told SON that because he was going to Philadelphia he would be unable to meet with KIM that day. KIM asked SON to call KIM's wife, JIN SOOK KIM LEE ("JIN SOOK"),[6] and arrange to meet with her. At approximately 12:06 p.m., KIM called JIN SOOK and gave her SON's phone number and asked her to call SON to find out where to meet and how to hand over the money. KIM told JIN SOOK that the money for SON was only the money in the plastic bag and not the $3,000 next to it. KIM called JIN SOOK a few minutes later, and she told him that SON had asked JIN SOOK to give the

---

[5] Based on my knowledge of the investigation, I believe that Eun-Hui Kim is a brothel owner or worker in the United States and the sender, as opposed to the recipient, of the money.

[6] Based on documentary evidence, including telephone subscriber information and cable bills, we have determined that KIM's wife is JIN SOOK KIM LEE.

money to SON's wife [MIAE CHOI-SON].[7] JIN SOOK said that she and SON's wife decided to meet at Bay Terrace Mall in Flushing [New York]. JIN SOOK said that she would take two bundles of money and the processing fee. At approximately 12:15 p.m., KIM told SON that there were two money bundles, one with 10 bills and the other with 13 bills. KIM told SON to send the 10 bill bundle to the regular place where KIM had been sending money, and added that the other bundle only had an account number without a phone number attached. At approximately 12:59 p.m., JIN SOOK asked KIM for the name of the person to whom she was supposed to give the money, and KIM said that it was SON, but that SON'S wife would take the money. At approximately 1:16 p.m., JIN SOOK told KIM that she had just handed the money over to SON'S wife. At approximately 1:50 p.m., a female known as "Sunny" [a sex worker] called KIM from "Smile" [a brothel in Pennsylvania], and asked KIM if he (KIM) could send $7,000 or $8,000 for her. Based on my experience and knowledge of the investigation, I believe that Sunny was asking KIM to conduct a hawala transaction to Korea with money that she had earned as a sex worker. At approximately 5:28 p.m., KIM told SON that he would have another transaction for $7,000 or $8,000 later that evening, at around 8:00 or 10:00 p.m. At approximately 5:31 p.m., JIN SOOK called KIM to confirm that she had delivered the correct amount of money to SON. KIM confirmed that she had.

---

- The investigation concerning SON confirmed the identity of his wife to be that of MIAE CHOI-SON.

72. On May 3, 2006, at approximately 11:16 p.m., a female known as "Seon-Hui" called KIM to ask what had happened with the money exchange. KIM said that she would have to verify [the deposit] after the close of business.

73. On May 3, 2006, at approximately 12:26 p.m., Sunny called KIM regarding the money transaction she had spoken to KIM about on May 1, 2006, at approximately 1:50 p.m. (see Paragraph 71). KIM told Sunny that he was on his way to pick up the money from an unidentified male, who was delivering it for Sunny [from Smile brothel in Philadelphia] to KIM in Flushing.

74. On May 3, 2006, at approximately 3:01 p.m., KIM called a female known as "Sang-A," who asked KIM if he had sent the money to Korea. KIM advised Sang-A to confirm whether someone in Korea had received the money. At approximately 7:05 p.m., "Sang-A" called KIM and told him that 9.2 million Korean Won [equivalent to more than $9,000] had been deposited two days earlier. Sang-A had not verified whether the other sex worker's money had been successfully sent.

75. Based on my experience and knowledge of the investigation, I believe that the two bundles of money delivered by KIM through his wife, JIN SOOK, to SON through his wife, MAIE CHOI-SON, on May 1st were proceeds from prostitution being sent by Sang-A and another sex worker from the United States to Korea.

(v) <u>FNU LNU, also known as "Jong Tae" ("JONG TAE")</u>

76. On May 12, 2006, at approximately 1:00 p.m., JONG TAE told KIM that JONG TAE used to assist in the money

transmitting business of a Korean money transmitter (the "Money Transmitter") and that JONG TAE would give the Money Transmitter $100 and keep $200 for himself for every $10,000 that was transmitted. JONG TAE told KIM that the Money Transmitter wanted to be introduced to someone else that would bring him hawala business. JONG TAE told KIM that he wanted to introduce the Money Transmitter to KIM. KIM agreed that giving the money directly to a Korean recipient would be better than sending the money through a bank because Korean authorities started cracking down on illegal money exchange transactions involving banks. JONG TAE stated that many people were caught, and that the Money Transmitter would no longer do transactions through banks. KIM told JONG TAE to give KIM's phone number to the Money Transmitter so that he could call KIM, since KIM engaged in money exchanges because he traveled to different brothel locations. JONG TAE told KIM that the Money Transmitter was willing to go to Flushing daily for money exchange meetings with KIM. JONG TAE told KIM that, if the Money Transmitter received $100 for every $10,000 transaction, then JONG TAE would also receive some payment. JONG TAE confirmed that KIM would pay one percent as a fee to the Money Transmitter for every $10,000 exchanged. JONG TAE told KIM that the Money Transmitter used to give him $50 if JONG TAE was the middleman for a hawala transaction between the Money Transmitter and other drivers. JONG TAE told KIM that JONG TAE dealt with the Money Transmitter because he gave a better deal than other money transmitters. KIM asked JONG TAE if any amount

would be acceptable to exchange, and JONG TAE responded that $2,000 or $3,000 was too small for the Money Transmitter to go to Flushing. KIM said that he would call the Money Transmitter for money exchanges over $5,000. KIM told JONG TAE to have the Money Transmitter call him.

77. On May 12, 2006, at approximately 1:16 p.m., JONG TAE told KIM that the Money Transmitter would call KIM. JONG TAE told KIM that the Money Transmitter would collect money from KIM and that the Money Transmitter's associate would deliver the money to the recipient in Korea at the same time.

78. On May 12, 2006, at approximately 1:20 p.m., the Money Transmitter called KIM and confirmed that he only did direct exchanges and would not use a bank. KIM and the Money Transmitter discussed fees, minimum transfer amounts, the immediacy of transfer, the reliability of the method, and how to handle recipients outside of Seoul, Korea. KIM told the Money Transmitter that some weeks, KIM sends tens of thousands of dollars. KIM told the Money Transmitter that, during the current week, he had sent between $20,000 and $30,000.

79. On May 18, 2006, at approximately 4:50 p.m., JONG TAE asked KIM if he had met with the Money Transmitter yet. KIM told JONG TAE that KIM had only spoken with him on the phone, but had not yet used him for hawala transactions.

80. Department of Treasury, Financial Crimes Enforcement Network ("FINCEN"): A search of the FINCEN database

reveals that KIM, SON, and MIAE CHOI-SON are not licensed money transmitters.

C. Violation of Pre-Sentence Bail Conditions by BYOUNG IL SON, also known as "Mr. Son" ("SON")

81. On May 25, 2005, SON was arrested, pursuant to an arrest warrant issued in this District, on a charge of conducting an illegal money transmitting business, in violation of Title 18, United States Code, Section 1960(a). On May 31, 2005, SON was released on bail after signing an order which set forth conditions for his release. Included among the conditions was that SON "not commit any federal, state, or local crime." See "Order Setting Conditions of Release and Bond" at 2, which is attached hereto.

82. On May 31, 2006, SON pleaded guilty to conducting and managing an illegal money transmitting business, in violation of Title 18, United States Code, Section 1960(a). Following his guilty plea, the conditions of bail previously ordered on May 31, 2005 were continued. Based upon the facts set forth above, there is probable cause to believe that SON committed a federal violation while on release, to wit, conducting and managing an illegal money transmitting business, in violation of the conditions of his release set by the court, pursuant to Title 18, United States Code, Section 3148.

WHEREFORE, your affiant respectfully requests that arrest warrants be issued for TAE HOON KIM, also known as "Tae Won," SUNG CHUL IL, also known as "Seong-Cheol" and "Cheol-I,"

FNU LNU, also known as "Seong Ho," TAE JUN PARK, also known as "Tae Ho Choi," DO HYUP BAE, also known as "Do Hyeop," BYUNG CHUL SHIN, also known as "Byeong-Cheol," FNU LNU, also known as "Hong Tae" and "Hong Pyo," KYONG POLACHEK, also known as "Ji-Yeon Kim," "Jennifer" and "Hana," BYOUNG IL SON, also known as "Mr. Son," JIN SOOK KIM LEE, MIAE CHOI-SON, and FNU LNU, also known as "Jong Tae," so that they may be dealt with according to law, and that this Affidavit and the arrest warrants be filed under seal to prevent the flight of the defendants and other subjects of the investigation and the destruction of evidence.

WON YOON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
14th day of August, 2006

United States Magistrate Judge
Eastern District of New York

**INDEX**

| DEFENDANT | REFERENCED PARAGRAPHS |
|---|---|
| SUNG CHUL IL ("CHEOL-I") | ##14-20 |
| FNU LNU ("SEONG HO") | ##21-31 |
| TAE JUN PARK ("CHOI") | ##32-39 |
| DO HYUP BAE ("DO HYEOP") | ##40-42 |
| BYUNG CHUL SHIN ("BYEONG-CHEOL") | ##43-46 |
| FNU LNU ("PYO") | ##47-51 |
| KYONG POLACHEK ("JI-YEON") | ##52-56 |
| BYOUNG IL SON ("SON") | ##67-75, 81-82 |
| JIN SOOK KIM LEE | ##71, 75 |
| MIAE CHOI-SON | ##71, 75 |
| FNU LNU, ("JONG TAE") | ##76-79 |